IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | : | CIVIL ACTION |
| COMMISSION | : | |
| | : | |
| v. | : | |
| | : | |
| TIMOTHY J. MCGEE, MICHAEL W. | : | NO.   12-1296 |
| ZIRINSKY, ROBERT L. ZIRINSKY, KELLIE | : | |
| F. ZIRINSKY, JILLYNN ZIRINSKY, | : | |
| GERALDINE A. ZIRINSKY, and MARY L. | : | |
| ZIRINSKY | : | |

## MEMORANDUM OPINION

Savage, J.                                            September 12, 2012

In this securities fraud action brought by the Securities and Exchange Commission
("SEC") based upon a misappropriation theory of liability under § 10(b) of the Securities
Exchange Act of 1934[1] and SEC Rule 10b-5,[2] defendants Timothy McGee, Michael
Zirinsky and Robert Zirinsky have moved to dismiss the complaint.  They contend that the
complaint does not sufficiently allege the existence of a relationship of trust and
confidence, an essential element of an insider trading cause of action under the
misappropriation theory.  As he did in his motion to dismiss the indictment in his related
criminal action,[3] McGee argues that the SEC's defining the requisite relationship in Rule
10b5-2[4] exceeded its rulemaking authority.  The remaining defendants join in McGee's
motion.  Michael and Robert Zirinsky additionally argue that the complaint does not

---

[1] 15 U.S.C. § 78j (2006).

[2] 17 C.F.R. § 240.10b-5.

[3] *United States v. McGee*, Crim. No. 12-236 (E.D. Pa.) (filed May 10, 2012).

[4] 17 C.F.R. § 240.10b5-2.

adequately plead that they acted with scienter.  Kellie Zirinsky, Jillynn Zirinsky, Geraldine Zirinsky and Mary Zirinksy challenge their status as relief defendants.  They argue that they are not "proper relief defendants" because they have a legitimate property interest in the profits they realized from selling the stock purchased for them by Michael Zirinsky.

We conclude that the complaint alleges facts, which if proven, would demonstrate that the SEC has stated a cause of action for violations of § 10(b) of the Securities Exchange Act of 1934 against McGee and Michael Zirinsky.  Specifically, it recites that McGee shared a relationship of trust and confidence with the insider; breached his duty of trust arising out of that relationship; used, without disclosing to the insider, material nonpublic information he received during the course of the relationship to trade in stock; and passed the information to Michael Zirinsky who also used to it trade in the stock and to tip a friend and his family members.  The complaint also alleges that Michael Zirinksy and his father, Robert Zirinsky, knew or should have known that the information was from an insider in violation of the law.

On the other hand, the complaint falls short of pleading facts supporting a plausible inference that Michael's father, Robert, acted with the requisite scienter.  There are no allegations from which one could infer that Robert is a sophisticated trader like his son, nor are there any identifying the source of the information he acted upon to trade in the stock. Therefore, we shall deny the motions to dismiss of McGee and Michael Zirnisky, and grant Robert's motion and dismiss the complaint as to Robert.

Assuming the truth of the well-pleaded factual allegations in the complaint, the profits the relief defendants realized after selling their shares were the ill-gotten gains of trading based on misappropriated material, nonpublic information.  Because the relief

defendants do not have a legitimate property interest in those profits, the SEC may seek disgorgement.  Therefore, the relief defendants' motions to dismiss will be denied.

### The Allegations in the Complaint

The complaint alleges that McGee, a registered stock broker, used material, nonpublic information he obtained from a corporate insider during the course of a confidential relationship between himself and the source of the information.  According to the complaint, McGee obtained information in July, 2008 about the pending acquisition of Philadelphia Consolidated Holding Corporation ("PHLY"), a company publicly traded on the NASDAQ, from a senior executive at PHLY who was involved in the merger process. McGee used the information to trade in shares of stock and to tip his friend and co-worker, defendant Michael Zirinsky, who also profited from trading on the information and in turn tipped a friend and family members.

The complaint recites that McGee and the insider, the senior PHLY executive, were members of Alcoholics Anonymous ("AA").  They formed a close personal relationship, which engendered mutual trust and confidence arising out of their AA membership.[5] During a confidential conversation following an AA meeting, the insider told McGee that he had been drinking as a result of pressure from working on the pending sale of PHLY to another company.   McGee "expressed interest in the details of the PHLY sale and questioned the Insider about the details of the impending deal."[6]

---

[5] Compl. ¶ 39.

[6] *Id.* at ¶ 47.

On the basis of information he learned from the insider during several conversations, McGee purchased 10,750 shares of PHLY stock for $359,248.00, at an average cost of approximately $33.00 per share, prior to the July 23, 2008 public announcement of PHLY's sale.[7]

On the morning of July 17, 2008, McGee tipped his friend and co-worker, Michael Zirinsky, also a registered stock broker.  Michael then tipped his friend, Paulo Lam, and his sister, Jillynnn Zirinsky.  He also attempted to tip his father, Robert Zirinsky.  Michael purchased PHLY stock for three of his own accounts and the accounts of his wife, Kellie; his sister, Jillynn; his mother, Geraldine; and his grandmother, Mary.  Michael also purchased PHLY shares for IRA accounts held by Robert and Geraldine.[8]  That same morning, Robert purchased additional PHLY shares for an account at "Broker B" he held jointly with his wife, Geraldine.[9]  Collectively, the Zirinksys purchased 21,650 shares of PHLY stock.[10]

On July 22, 2008, PHLY's board of directors approved the final merger agreement.  PHLY stock was trading at $35.55 a share at that time.  Between April 22 and July 22, 2008, it traded in the range of $31.22 to $38.64 a share.  On July 23, 2008, PHLY publicly announced that Tokio Marine Holdings, Inc. was acquiring it in a cash deal at a price of $61.50 a share.  That day, the stock closed at $58.43.  Later, when the deal closed,

---

[7] *Id.* at ¶ 52.

[8] *Id.* at ¶¶ 61-62.

[9] *Id.* at ¶ 63.

[10] *Id.* at ¶ 64.

4

shareholders were paid $61.50 a share.[11]

Two days after PHLY's sale was publicly announced, McGee sold 3,250 shares for $58.50 per share.  He received $61.50 per share for his remaining shares after the PHLY's sale closed on December 1, 2008.  In total, McGee realized profits of $292,128.00 from his PHLY trades.[12]

Within days of the merger announcement, much of the Zirinsky family's PHLY stock was sold.  Their remaining shares were held until the merger closed on December 1, 2008.[13]

Michael realized a profit of $46,396.00;[14] his wife, $49,628.00;[15] Robert and Mary jointly, $53,620.00;[16] Jillynn, $30,538.00;[17] Robert, $80,688.00 in his IRA account;[18] Mary, $194,134.00;[19] and Geraldine's IRA account, $107,669.00.[20]  In total, the Zirinskys realized a profit of $562,673.00.[21]

The SEC alleges that McGee, Michael and Robert violated § 10(b) of the Securities

---

[11] *Id*. at ¶¶ 27-30.

[12] *Id*. at ¶ 53.

[13] *Id*. at ¶ 78.

[14] *Id*. at ¶ 79.

[15] *Id*.

[16] *Id*. at ¶ 82.

[17] *Id*. at ¶ 80.

[18] *Id*. at ¶ 83.

[19] *Id*. at ¶ 81.

[20] *Id*. at ¶ 84.

[21] *Id*. at ¶ 85.

Exchange Act of 1934 and Rule 10b-5, predicated on a relationship of trust or confidence as defined in SEC Rule 10b5-2.[22]  Although it does not claim that the relief defendants violated securities laws, it seeks disgorgement of their profits from their PHLY stock sales under an unjust enrichment theory.

## The Misappropriation Theory of Insider Trading

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, proscribes using a deceptive device in connection with the purchase or sale of securities in contravention of rules prescribed by the SEC.  Pursuant to this Congressional delegation, the SEC promulgated Rule 10b-5, 17 C.F.R. § 240.10b-5.  The Rule proscribes, in relevant part, "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a), (c).

There are two bases for insider trading liability under § 10(b) and Rule 10b-5.  The "traditional" or "classical theory" applies where a corporate insider trades in securities of the corporation using material, nonpublic information he obtained as a result of his insider position.  *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).  An insider is anyone connected to the corporation, including not only officers, directors and employees, but also those working in a fiduciary capacity for the corporation, such as attorneys and accountants.  *Id.* (citing *Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983)).  The

---

[22] 17 C.F.R. 240.10b5-2.

6

"misappropriation theory" holds an outsider liable.  It applies to one who, while owing a duty of loyalty and confidentiality to the insider source of the information, uses that nonpublic information to trade in securities.  *Id.* at 652.  The difference between the two theories is that the traditional theory is based on the defendant's relationship to the corporation, whereas the misappropriation theory focuses on the defendant's relationship to the insider, not the corporation.

Both bases of liability are premised on deception and a breach of duty.  *Id.*  In the traditional scenario, the insider deceives the corporation and breaches his duty to the corporation's shareholders with whom he has a fiduciary relationship.  *Id.*  In the misappropriation setting, the person using the information deceives the source of the information, breaching his duty of loyalty and confidentiality to that person.  *Id.*  The deception occurs when the confidant fails to disclose to the source that he intends to rely on the nonpublic information to trade in the securities or share the information with others. *Id.* at 652-53.

Determining who is an insider for purposes of applying the classical theory of § 10(b) liability poses little difficulty and is typically self-evident.  One's employment position or professional relationship to the corporation usually makes it an easy task.  Who is a confidant under the misappropriation theory is not always as simple and apparent.  Indeed, whether one was in a requisite relationship has produced conflicting decisions. *Compare, e.g.*, *SEC v. Kirch*, 263 F. Supp. 2d 1144, 1147,1151 (N.D. Ill. 2003) (finding that because the defendant and insider were members of a business roundtable that had an express policy and understanding that business discussions were to be kept confidential, the defendant owed the insider a duty sufficient to impose misappropriation theory liability),

*with United States v. Kim*, 184 F. Supp. 2d 1006, 1008, 1012 (N.D. Cal. 2002) (finding that although the defendant and insider signed confidentiality agreements as members of a business organization, the defendant lacked the requisite duty to impose liability for tipping others and trading on nonpublic information shared by the insider).  Because the recipient of the information under the misappropriation theory is not an insider, but actually an outsider, the contours of the relationship must be carefully scrutinized.

Following the Supreme Court's approval of the misappropriation theory in *O'Hagan*, the SEC promulgated Rule 10b5-2, 17 C.F.R. § 240.10b5-2, to clarify the types of relationships giving rise to a duty of trust or confidence.  Selective Disclosure and Insider Trading, 64 F. Reg. 72590, 72602 (Dec. 28, 1999).  The Rule codified a non-exhaustive list of "duties of trust or confidence," the breach of which can form the basis of liability under the misappropriation theory.  The duty arises where there is an agreement to keep the information confidential, *id.* at § 240.10b5-2(b)(1); when the parties to the communication have "a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality," *id.* at § 240.10b5-2(b)(2); or where the information is shared with a spouse, parent, child, or sibling.  *Id.* at § 240.10b5-2(b)(3).

**Validity of Rule 10b5-2**

Because the SEC's theory of liability of all defendants rests upon Rule 10b5-2, we shall start our analysis by considering the challenge to the Rule.  If it is valid, we shall

address the sufficiency of the complaint as to each defendant.[23]

McGee challenges Rule 10b5-2 on two grounds.  First, he argues that it is an unlawful expansion of § 10(b).  Second, he contends that even if the Rule is based on a permissible reading of the statute, the Rule is void for vagueness.[24]

McGee argues that Rule 10b5-2 is an unlawful expansion of § 10(b).  He contends that the Supreme Court has interpreted § 10(b)'s "deceptive device" language to require the breach of a recognized fiduciary or fiduciary-like duty.  According to McGee, insofar as Rule 10b5-2 imposes a duty based on a confidentiality agreement, Rule 10b5-2(b)(1), or a history, pattern, or practice of sharing confidences, Rule 10b5-2(b)(2), it impermissibly "expands insider trading liability beyond what the Supreme Court has found Section 10(b) prohibits."[25]  In other words, the Rule impermissibly includes non-fiduciary relationships not previously recognized as triggering a duty of trust or confidence.

The SEC, relying on Congress's express delegation in § 10(b), counters that the Rule is entitled to *Chevron* deference.  It argues that the Rule is consistent with § 10(b)'s requirements and is the product of a valid exercise of the SEC's authority.

Where Congress has authorized an agency to administer a statute, the agency's interpretation of the statute is entitled to deference.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984).  If the statute expressly delegates

---

[23] The SEC argues in the alternative that the complaint sufficiently alleges a relationship of trust and confidence without relying on Rule 10b5-2.  Because we hold that the Rule is based on a permissible interpretation of the statute, we need not address this argument.

[24] McGee incorporated the motion to dismiss his indictment in seeking dismissal of the complaint.

[25] Mem. of Timothy J. McGee in Supp. of Mot. to Dismiss Count One of the Indictment ("McGee Mem.") at 13.

rulemaking authority to the agency, the agency's interpretation must be given effect as long as it is based on a permissible reading of the statute.  *Id.* at 843.

In § 10(b), Congress expressly delegated to the SEC the authority to define a criminal offense.  The statute provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

The Supreme Court in *O'Hagan* recognized this delegation in approving the misappropriation theory.  521 U.S. at 650-51; *see also Loving v. United States*, 517 U.S. 748, 767 (1996) (observing that the Supreme Court has  "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal, so long as Congress makes the violation of regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute'" (quoting *United States v. Grimaud*, 220 U.S. 506, 518 (1911))).

McGee argues that although the statute left a gap for the SEC to fill, the Supreme Court in *O'Hagan* filled it by defining the relationship required to trigger liability under §10(b) as a recognized fiduciary, or fiduciary-like relationship.  Consequently, McGee maintains that the SEC, in implementing Rule 10b5-2, impermissibly expanded misappropriation liability by adding relationships that impose a duty of trust or confidence beyond what the Supreme Court defined in *O'Hagan*.  This is not a novel argument.  It has been made and rejected in numerous cases.  *See, e.g.*, *SEC v. Cuban*, 620 F.3d 551, 555

(5th Cir. 2010).

We disagree with McGee and agree with the courts of appeal who have rejected this argument, holding that the predicate relationship is not always a recognized, fiduciary relationship in the pure legal sense.  "*O'Hagan* did not set the contours of a relationship of 'trust and confidence' giving rise to the duty to disclose or abstain and misappropriation liability."  *Id.*; *see also SEC v. Dorozhko*, 574 F.3d 42, 49 (2d Cir. 2009) ("*Cinarella*, *O'Hagan*, and *Zandford* all stand for the proposition that nondisclosure in breach of a fiduciary duty satisfies § 10(b)'s requirement for a deceptive device or contrivance. However, what is sufficient is not always what is necessary, and none of the Supreme Court opinions considered by the District Court *require* a fiduciary relationship as an element of an actionable securities claim under Section 10(b)") (internal quotations and alterations omitted); *SEC v. Yun*, 327 F.3d 1263, 1271-72 (11th Cir. 2003) (noting that prior to Rule 10b5-2, "it [was] unsettled whether non-business relationships, such as husband and wife, provide the duty of loyalty and confidentiality necessary to satisfy the misappropriation theory" and holding that the breach of an agreement to maintain business confidences or a history of sharing business confidences suffices to yield insider trading liability).  Indeed, McGee concedes in his motion to dismiss that the *O'Hagan* Court "did not elaborate on the requisite relationship giving rise to the duty and deception."[26]  Because Congress delegated rulemaking authority under § 10(b) to the SEC and *O'Hagan* did not preclude the SEC from defining the relationship of trust or confidence, we proceed to step two of the *Chevron* analysis.

---

[26] McGee Mem. at 6.

Where, as here, Congress has explicitly delegated rulemaking authority to effectuate a statute, rules promulgated pursuant to that authority are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44; *Astrue v. Capato*, __U.S. __, 132 S. Ct. 2021, 2034 (2012) (same); *see also O'Hagan*, 521 U.S. at 673-75 (applying the "arbitrary, capricious, or manifestly contrary to the statute" standard and upholding an SEC rule promulgated pursuant to § 14(e) of the Exchange Act). After examining the SEC's justification for the rule and evaluating it in light of § 10(b), we conclude that the Rule is not arbitrary, capricious, or manifestly contrary to the statute.[27]

The SEC recognized that following *O'Hagan*'s approval of the misappropriation theory, "[i]t [was] not as settled . . . under what circumstances certain non-business relationships, such as family and personal relationships, may provide the duty of trust or confidence required under the misappropriation theory." Selective Disclosure and Insider Trading, 64 F. Reg. 72590, 72602 (Dec. 28, 1999). It observed that courts following a more restrictive view do not "fully recognize the degree to which parties to close family and personal relationships have reasonable and legitimate expectations of confidentiality in their communications." *Id*. Absent additional rulemaking, those with reasonable expectations of confidentiality may not have a breach of such expectations vindicated. The SEC's inability to challenge an investor's use of material nonpublic information in breach of a duty of trust or confidence stemming from personal or family relationships harmed investors and the integrity of securities markets. *Id.* at 72603. The SEC's response to

---

[27] This methodology parallels that used in *O'Hagan* to analyze an SEC rule promulgated pursuant to an express delegation by Congress. *See O'Hagan*, 521 U.S. at 674-75.

these concerns was to create a non-exhaustive list of categories of relationships giving rise to a duty of trust or confidence.  It did so by promulgating Rule 10b5-2.

We agree with the reasoning in *United States v. Corbin*, 729 F. Supp. 2d 607 (S.D.N.Y. 2010).  The district court found that the SEC's rulemaking was "buttressed by a thorough and careful consideration – one that far surpasses mere reasonableness – of the ends of § 10(b), the state of the current insider trading case law . . . and the need to protect investors.  *Id.* at 619.  *But cf. SEC v. Cuban*, 634 F. Supp. 2d 713, 731 (N.D. Tex. 2009) (holding that "permit[ing] liability based on Rule 10b5-2(b)(1) would exceed the SEC's § 10(b) authority to proscribe conduct that is deceptive," without discussing or applying *Chevron* deference) (citation omitted), *rev'd on other grounds*, 620 F.3d 551 (5th Cir. 2010).

McGee argues that *Corbin* is not persuasive because it rests upon a *Chevron* analysis, which is inappropriate under *United States v. Home Concrete & Supply, LLC*, __ U.S. __, 132 S. Ct. 1836 (2012).[28]  This argument ignores the Supreme Court's central holding in *Nat'l Cable and Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005), and is based on a misapprehension of *Home Concrete*.

According to *Brand X*, "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Id*.  Even if Rule 10b5-2 conflicted with prior Supreme Court precedent, which it did not, we would still need to determine whether the

---

[28] Supplemental McGee Mem. at 8-9, 11-12.

Court's prior interpretation was based on the unambiguous terms of the § 10(b). It was not. Hence, Chevron deference would still apply.

*Home Concrete* does not modify *Brand X*'s holding and is of no help to McGee. Four of the five Justices that joined the majority in *Home Concrete* did so because the Court's prior interpretation followed from the statute's *unambiguous* terms. *See* 132 S. Ct. at 1843-44 (Breyer, J., plurality) (observing that the Supreme Court's prior interpretation of the statute was based on its view that the statute left no gap for the agency to fill). Thus, consistent with *Brand X*, the Court's prior interpretation controlled.

Subsections 10b5-2(b)(1) and (2) are not manifestly contrary to § 10(b) because they are consistent with the statute's requirement that the defendant used a "deceptive device." *See O'Hagan*, 521 U.S. at 651 ("Liability under Rule 10b-5, our precedent indicates, does not extend beyond conduct encompassed by § 10(b)'s prohibition."). The deception occurs when the misappropriator betrays the insider's trust that the material nonpublic information will be safeguarded, based on either an agreement to maintain confidences, 10b5-2(b)(1), or a history of sharing and maintaining confidences. 10b5-2(b)(2).

In holding that subsections (b)(1) and (2) of Rule 10b5-2 are not arbitrary, capricious or manifestly contrary to § 10(b), we join the numerous courts that have rejected challenges to the Rule and those that have held that a relationship of trust or confidence may be based on either an agreement or a history of sharing and maintaining confidential information. *See Yun*, 327 F.3d at 1273 and n.23 (holding that "the existence of a duty of loyalty and confidentiality turn[ed] on whether [the insider-husband] granted his [allegedly misappropriating-wife] access to confidential information in reasonable reliance on a

promise that she would safeguard the information" and noting that this interpretation of the duty was bolstered by the SEC's preliminary statement of Rule 10b5-2); *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (noting that an "explicit acceptance of a duty of confidentiality" could form the basis of the functional equivalent to a fiduciary relationship); *SEC v. Northern*, 598 F. Supp. 2d 167, 174 (D. Mass. 2009) (relying on "persuasive caselaw holding that Rule 10b5-2(b) properly defines those circumstances under which misappropriation liability can arise" to reject the argument that the rule is invalid as an improper expansion of liability under § 10(b)) (citations omitted); *SEC v. Lyon*, 529 F. Supp. 2d 444, 452 (S.D.N.Y. 2008) (holding that the SEC alleged facts with requisite specificity to plausibly support its claim that a confidential relationship arose by agreement between the insider and the alleged misappropriator); *SEC v. Kornman*, 391 F. Supp. 2d 477, 489-90 (N.D. Tex. 2005) (denying motion to dismiss because the complaint contained allegations supporting the existence of a confidentiality agreement, thus bringing the case within Rule 10b5-2(b)(1)); *SEC v. Kirch*, 263 F. Supp. 2d 1144, 1147, 1151 (N.D. Ill. 2003) (finding the existence of a fiduciary-like relationship and attendant duty where the defendant traded on nonpublic information he gleaned as a member of a business roundtable, which had an express policy and understanding that such matters were to be kept confidential).

In summary, Rule 10b5-2 was promulgated by the SEC in the exercise of the authority granted to it by Congress. Because the Rule was neither arbitrary nor capricious, nor manifestly contrary to the statute, it is entitled to deference. Therefore, we conclude that the Rule is valid.

McGee incorporates the vagueness argument made in his criminal case. Because

there is no vagueness problem in his criminal case, where "the standard of certainty [that due process requires] is higher," *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983), his challenge in the civil case necessarily fails.  *See San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) ("Certainly if such general standards in criminal statutes are sufficiently precise to withstand attack to void for vagueness, analogous standards in the civil context where less specificity is required satisfy due process.").

We acknowledge that the scienter element differs for criminal and civil liability under § 10(b) and Rules 10b-5 and 10b5-2.  *See United States v. Gansman*, 657 F.3d 85, 91 n.7 (2d Cir. 2011) (observing that in criminal enforcement actions, the government must prove that the defendant acted wilfully whereas in civil actions, liability may be imposed if the SEC proves the defendant acted recklessly).  However, any vagueness concern for imposing civil liability for reckless actions, as opposed to the requisite willful violation in the criminal setting, is entirely ameliorated by the lesser penalties McGee faces in the civil action.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (observing that the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are less severe.").  Neither the text of Rule 10b5-2 nor its application to McGee violates due process.

## Sufficiency of the Complaint

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), giving the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93

(2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Although this standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).   Thus, "a formulaic recitation of the elements of a cause of action" is insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555).

A complaint may be dismissed if the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).   The plaintiff must allege facts that amount to "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Pleading only "facts that are 'merely consistent with' a defendant's liability" is insufficient and cannot survive a motion to dismiss. *Id*. (quoting *Twombly*, 550 U.S. at 557).

In determining whether the complaint meets the sufficiency test under *Iqbal* and *Twombly*, we apply a three-step analysis. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011).   First, we identify the elements of the plaintiff's cause of action. *Id.* (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).   Second, we discard conclusory statements, leaving only factual allegations. *Id.* (quoting *Santiago*, 629 F.3d at 130).   Third, assuming the truth of the well-pleaded factual allegations, we determine whether they plausibly give rise to an entitlement for relief. *Id.* (quoting *Santiago*, 629 F.3d at 130).

*McGee*

To prevail under the misappropriation theory, the SEC must prove by a

17

preponderance of the evidence that McGee: (1) misappropriated material, nonpublic information; (2) had a duty of trust or confidence;[29] (3) breached that duty; (4) purchased or sold securities based upon that information, or tipped another; and (5) knew or should have known that he was trading or tipping others on improperly obtained information.  *Dirks v. SEC*, 463 U.S. 646, 660 (1983); *SEC v. Michel*, 521 F. Supp. 2d 795, 822-23 (N.D. Ill. 2007) (citing *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995)); *SEC v. Willis*, 777 F. Supp. 1165, 1169 (S.D.N.Y.1991).

McGee argues that the complaint fails to adequately plead the second element of the offense.  He contends that the SEC failed to plead facts demonstrating that he owed the insider a duty of trust or confidence.  The SEC counters that the complaint includes enough factual allegations to support its assertion that McGee and the insider shared a relationship of trust or confidence under Rule 10b5-2(b)(1) and (2).

The complaint alleges that McGee and the insider had an agreement to keep information about their personal and professional lives confidential and that they had a history of sharing and maintaining confidences.  According to the complaint, as members of AA, McGee and the insider had an agreement of confidentiality;[30] "McGee assured the Insider on many occasions that he would keep the information they discussed confidential";[31] the insider considered McGee to be a "confidante" [sic];[32] and that McGee

---

[29] Although the court in *Michel* referred to a fiduciary duty, a breach of a duty of trust or confidence as defined by Rule 10b5-2 suffices.

[30] *See* Compl. ¶ 34 ("The confidentiality of information shared between members of the AA program is underscored at each meeting . . . .").

[31] *Id.* at ¶ 39.

[32] *Id.* at ¶ 36.

told the insider that he could "confide anything to him, . . . he had kept [his] confidences in the past, and would continue to do so."[33]

These factual allegations, assuming them true, would demonstrate that McGee and the insider had an agreement to maintain information in confidence, and a history of sharing and maintaining confidences, such that McGee knew or reasonably should have known that the insider expected McGee to keep the details of PHLY's pending merger confidential.  The alleged facts permit a plausible finding that McGee and the insider had a duty of trust and confidence as defined in subsections (1) and (2) of Rule 10b5-2(b).

Whether such a relationship of trust and confidence existed and whether the information was disclosed within the confines of that relationship are questions of fact.  These are facts for a jury to decide.  Therefore, McGee's motion to dismiss will be denied.


*Michael and Robert Zirinsky*

Michael Zirinsky and his father, Robert, seek dismissal of the complaint on two grounds.  They argue that because the SEC has not pleaded facts supporting the existence of a fiduciary-like relationship between McGee and the PHLY insider, there is no requisite breach of a duty that supplies a basis for liability for downstream tippees.  Alternatively, they argue that the SEC has not adequately pleaded scienter under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).

Michael and Robert make the same argument regarding the existence of a duty of trust and confidence that McGee makes.  For the same reason we reject McGee's

---

[33] *Id.* at ¶ 42.

argument, we deny their motions on this ground.  Because we have concluded that the complaint sufficiently pleads that McGee breached a duty of trust or confidence as defined by Rule 10b5-2(b)(1) and (2), we turn to Michael and Robert's scienter argument.

To state a claim for tippee liability under § 10(b) and Rule 10b-5, the complaint must allege sufficient facts that, if proven, would establish that: (1) McGee misappropriated material, nonpublic information; (2) he breached that duty of trust or confidence; (3) he shared the information with Michael; (4) Robert received this information from Michael; (5) Michael and Robert traded on the information; and (6) Michael and Robert knew or should have known that the information had been misappropriated from an insider.  *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (citing *Dirks v. SEC*, 463 U.S. 646, 659 (1983)); *SEC v. Anton*, No. 06-2274, 2009 WL 1109324, at *6 (E.D. Pa. Apr. 23, 2009) (same).[34]

A tippee's liability is derivative of the tipper's.  In other words, the tipper's culpability is imputed to the tippee.  Nevertheless, though the tipper knew that the information had been misappropriated, the tippee can be liable only if he knew or should have known that it had been.  *Maio*, 51 F.3d at 632.

Recklessness may establish scienter in securities fraud cases.  *SEC v. Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir. 2000).  As defined by the Third Circuit, in the context of securities transactions, recklessness is more than simple or inexcusable negligence.  It is an "extreme departure from the standards of ordinary care, . . . which presents a danger . . . that is either known to the defendant or is so obvious that the actor

---

[34] The elements required for tippee liability are the same under the classical and misappropriation theories.  *See SEC v. Yun*, 327 F.3d 1263, 1276 (11th Cir. 2003) ("[T]here is no reason to distinguish between a tippee who receives confidential information from an insider (under the classical theory) and a tippee who receives such information from an outsider (under the misappropriation theory.").

must have been aware of it." *Id.* (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979).

The scienter element requires the SEC to prove that Michael and Robert knew they were trading on improperly obtained information or recklessly disregarded that fact.[35] The SEC need not prove that they knew the insider and had any direct link to him, *SEC v. Sekhri*, No. 98-2320, 1998 WL 259932, at *2 (S.D.N.Y. May 21, 1998), or that they knew how the breach occurred. *SEC v. Thrasher*, 152 F. Supp. 2d 291, 304-05 (S.D.N.Y. 2001).

Pleading securities fraud under the misappropriation theory is subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirement. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (holding that "securities fraud claims, like other types of fraud claims, have always been subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements"). Although Rule 9(b) allows that mental states "may be alleged generally," consistent with the requirements elaborated upon by the Supreme Court in *Iqbal* and *Twombly*, the SEC's complaint must contain a factual basis supporting a plausible inference that the defendants acted with scienter. *SEC v. Steffes*, 805 F. Supp. 2d 601, 618 (N.D. Ill. 2011) (citations omitted); *SEC v. Geswein*, No. 10-1235, 2011 WL 4565898, at *21 (N.D. Ohio Aug. 5, 2011), *Report and Recommendation adopted in part, rejected in part on other grounds*, 2011 WL 4541303 (N.D. Ohio Sept. 29, 2011); *SEC v. Lee*, 720

---

[35] Although the Supreme Court in *Dirks* allowed that liability may attach if the tippee "knew or should have known" that he was trading on improperly obtained information, *Dirks*, 463 U.S. at 660, the Supreme Court has never held that negligence is sufficient and has yet to decide whether recklessness, in addition to willfulness, satisfies the scienter requirement. *Matrixx Initiatives, Inc. v. Siracusano*, __ U.S. __, 131 S. Ct. 1309, 1323 (2011). The Third Circuit has held that scienter for securities fraud includes recklessness. *Infinity Grp. Co.*, 212 F.3d at 192; *see also SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) ("Section 10(b) . . . require[s] the SEC to establish at least recklessness . . . ."); *United States v. Gansman*, 657 F.3d 85, 91 n.7 (2d Cir. 2011) (observing that civil liability under the misappropriation theory may attach if the SEC proves by a preponderance of the evidence that the defendant's conduct was merely reckless, rather than willful).

F. Supp. 2d 305, 321 (S.D.N.Y. 2010).

In the insider trading context, scienter may be inferred from circumstantial evidence because "the specific facts are peculiarly within the knowledge of the defendants."  *SEC v. Argon Capital Mgmt., LLC*, No. 07-919, 2008 WL 216320, at *3 (S.D.N.Y. Jan. 16, 2008); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 n.30 (1983) (noting that "circumstantial evidence can be more than sufficient" to demonstrate scienter in securities fraud cases).  Circumstantial evidence probative of scienter includes the sophistication of the tippee,[36] the temporal proximity of communications between the tippee and the insider or alleged misappropriator and the tippee's trades,[37] and trades atypical to the tippee's

---

[36] *See SEC v. Carroll*, No. 11-165, 2011 WL 5880875, at *8 (W.D. Ky. Nov. 23, 2011) ("A tippee's sophistication supports an inference of knowledge that information was obtained in violation of the tipper's fiduciary duty.") (citations omitted); *SEC v. Michel*, 521 F. Supp. 2d 795, 828 (N.D. Ill. 2007) (holding SEC demonstrated scienter in part because the defendant had more than ten years of experience as a licensed stockbroker); *SEC v. Blackman*, No. 99-1072, 2000 WL 868770, at *8 (M.D. Tenn. May 26, 2000) (holding that the defendants' experience as stockbrokers helped support an inference that they knew or recklessly disregarded that the dissemination of the material, nonpublic information breached a duty of confidentiality); *SEC v. Musella*, 578 F. Supp. 425, 442 (S.D.N.Y. 1984) (granting a preliminary injunction where a stockbroker was a "sophisticated . . . market professional" and finding "it highly improbable that he would invest large sums of money on three occasions in various securities without ascertaining the source, reliability, and underlying circumstances of the tip received").

[37] *See SEC v. Ginsburg*, 362 F.3d 1292, 1299 (11th Cir. 2004) ("The temporal proximity of a phone conversation between the trader and one with insider knowledge provides a reasonable basis for inferring that the basis of the trader's belief was the inside information. The larger and more profitable the trades, and the closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information"); *Maio*, 51 F.3d at 633 (upholding conviction and finding there was sufficient evidence that the tippee acted with scienter where he knew the insider's position in the corporation and bought the stock in question shortly after speaking with the insider); *Steffes*, 805 F. Supp. 2d at 618 (holding "suspicious timing" of phone conversations between the insider and the defendant supported an inference of scienter) (citing *SEC v. Alexander*, 160 F. Supp. 2d 642, 652-53 (S.D.N.Y. 2001); *Warde*, 151 F.3d at 47-48); *SEC v. Scoppetoulo*, No. 10-20475, 2011 WL 294443, at *3 (S.D. Fla. Jan. 27, 2011) ("Suspicious timing of communications and trading support an inference of bad faith and scienter.") (citation omitted); *SEC v. Kornman*, 391 F. Supp. 2d 477, 493 (N.D. Tex. 2005) ("The SEC's allegations regarding the extremely opportunistic timing of Kornman's purchases immediately after learning the confidential information . . . support an inference that he had adequate scienter and provide strong circumstantial evidence of conscious behavior.").

investment patterns.[38]

The facts alleged in the complaint support a plausible inference that Michael Zirinsky acted with scienter.  Michael, a stockbroker and registered financial representative since 1995, is a sophisticated tippee.  He purchased shares of PHLY stock and tipped others of the pending merger shortly after speaking with McGee, the alleged misappropriator. McGee called Michael on the morning of July 17, 2008 "[a]lmost immediately" after speaking with the insider.[39]  Seconds later, Michael attempted to reach his father, Robert at three different numbers, and then called Paulo Lam and his sister Jillynn.[40]  That same morning, Michael purchased PHLY stock for three of his personal accounts and the accounts of his wife, sister, mother, and grandmother, all named as relief defendants.[41] He also entered trades in IRA accounts held by Robert and Geraldine.[42]

The SEC also alleges that Michael's trades were unusual in type and amount. Michael purchased 1,805 PHLY shares in his three personal accounts, totaling $59,981 and constituting 66 percent, 95 percent, and 100 percent of the respective values of the

---

[38] *See SEC v. Adler*, 137 F.3d 1325, 1340-41 (11th Cir. 1998) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter.") (citation omitted); *Maio*, 51 F.3d at 633 (upholding conviction against downstream tippee and holding that her spending approximately $155,000 to buy stock when her income was only $11,000 and she had virtually no liquid assets further corroborated the inference that she knew the information was shared in breach of the duty); *Michel*, 521 F. Supp. 2d at 828-29 (holding that the large purchases the defendant made on behalf of himself, his family, and his clients beginning the morning after he spoke with the tipper supported finding that he knew or should have known that the material nonpublic information should not have been disseminated); *SEC v. Musella*, 748 F. Supp. 1028, 1039 (S.D.N.Y. 1989)("[T]he amounts involved and the financing of the trades suggest that [the tippee's] confidence that these investments would 'pan out' quickly was unusually high, and thus suggestive of insider trading.").

[39] Compl. ¶ 60.

[40] *Id.* at ¶ 61.

[41] *Id.* at ¶ 62.

[42] *Id.*

three accounts.[43]  He purchased 1,975 shares for his wife Kellie's two accounts, which accounted for 99 and more than 100 percent of the respective account values.[44]  Michael sold securities and deposited additional money into the accounts to fund these purchases.[45]  He also purchased 1,210 shares in his sister Jillynn's account and 7,400 shares in his grandmother Mary's account.[46]  Michael funded some of these purchases by selling holdings in the respective accounts.[47]

These alleged facts, if proven, would show the following: a sophisticated and knowledgeable tippee; a close temporal proximity of his communications with McGee and his trades; the physical proximity and working relationship between him and McGee; and highly unusual trades.  These facts plausibly give rise to a claim that Michael is liable as a securities fraud tippee.  Therefore, we shall deny his motion to dismiss.

The facts alleged as to Robert fall short of establishing a plausible inference that he is liable as a tippee.  Although there are some alleged facts that tend to show that he is, there are insufficient facts that he knew or recklessly disregarded that the information was tainted.   A plaintiff must plead facts that are more than "merely consistent with the defendant's liability."  *Iqbal*, 556 U.S. at 678 (quotation omitted).  The SEC has not done so.

According to the complaint, Robert purchased PHLY shares in five accounts at

---

[43] *Id.* at ¶ 66.

[44] *Id.* at ¶ 69.

[45] *Id.* at ¶ 70.

[46] *Id.* at ¶¶ 67-68.

[47] *Id.* at ¶ 70.

about the same time Michael bought his.  Robert purchased 9,170 PHLY shares over a twelve minute period.[48]  According to the SEC, these purchases were "highly unusual and inconsistent with the other trading in the account throughout 2008."[49]  For example, his purchase in his "Broker B" account temporarily quadrupled his margin balance until he deposited more than $25,000 to cover the excess margin, and his PHLY holdings were over six-times the size of the next largest position in the account.[50]

These well-pleaded factual allegations, which point to Robert expending significant sums of money relative to the size of his portfolio, support a reasonable inference that he was confident the stock was a good deal.  These allegations by themselves do not support a plausible inference that he acted with scienter.  Indeed, the remaining allegations and what is not alleged reasonably permit a contrary inference.  Unlike his son, Robert is not a sophisticated purchaser.  The complaint alleges that Michael *attempted* to contact Robert at three different numbers on the morning of July 17.[51]  It does not allege that Michael contacted Robert.  On the contrary, the complaint infers that he did not.  The timing of his trades supports a reasonable inference that someone recommended that he buy the stock.  There are no allegations identifying who gave Robert the advice or what advice he was given.[52]  The complaint alleges that Michael was successful in contacting his sister and

---

[48] *Id*. at ¶ 72.

[49] *Id*. at ¶ 73.

[50] *Id*.

[51] *Id*. at ¶ 61.

[52] Although this is also true with the allegations as to Michael, the SEC remedies this shortcoming by pointing to Michael's sophistication as a tippee and McGee's call to Michael shortly after speaking with the insider.

Robert's daughter, Jillynn.  In short, comparing the allegations against the relief defendants with those against Robert, we see no real distinction between Robert and the relief defendants as to the element of scienter.  Thus, because there are insufficient averments to support a plausible inference that Robert acted with scienter, we shall grant his motion to dismiss the complaint.

*Relief Defendants*

The SEC does not assert an action for insider trading against the relief defendants Kellie, Jillynn, Geraldine and Mary Zirinksy.  Instead, using a theory of unjust enrichment, it seeks disgorgement of their profits from the sale of their PHLY stock.  The relief defendants move under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss the complaint, contending that because they have a legitimate ownership interest in the profits they earned from the sale of their PHLY stock, there is no subject matter jurisdiction to order disgorgement of those monies.

The district court has jurisdiction over claims in equity arising under the Exchange Act.  *See* 15 U.S.C. § 78aa (2006) (The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."); 15 U.S.C. § 78u(d)(5) (2006) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.").  The Act confers federal courts with jurisdiction over claims against defendants not accused of

26

violating the statute.  *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).  Attendant to this jurisdiction, courts have "the authority to grant the full panoply of equitable remedies so that the plaintiff can obtain complete relief."  *SEC v. Antar*, 831 F. Supp. 380, 398 (D.N.J. 1993) (citing *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).  Subject matter jurisdiction to order disgorgement of funds relief defendants possess derives from a named defendant's underlying violation of securities laws.  *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191-92 (4th Cir. 2002).

The parties agree that we should apply the test the Second Circuit applied in *Cavanagh*, 155 F.3d 129.  *Cavanagh* requires the SEC to demonstrate that the relief defendants received ill-gotten funds and they have no legitimate claim to those funds.  *Id.* at 136; *see also SEC v. Smith*, 653 F.3d 121, 128 (2d Cir. 2011) (applying *Cavanagh*).

Although the Third Circuit has not addressed the *Cavanagh* test, other circuits have adopted it.  *See In re Sherman*, 658 F.3d 1009, 1022 (9th Cir. 2011) ("Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." (quoting *Cavanagh*, 155 F.3d at 136)); *Janvey v. Adams*, 588 F.3d 831, 835 n.2 (5th Cir. 2009) (same); *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (same); *Kimberlynn Creek Ranch,* 276 F.3d at 192 (same); *see also SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("[T]he creditor plaintiff must show that the nominal defendant has received ill gotten funds *and* that he does not have a legitimate claim to those funds."); *SEC v. Cherif*, 933 F.2d 403, 414 n.11 (7th Cir. 1991) ("A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is

established that the non-party possesses illegally obtained profits but has no legitimate claim to them.").

District courts in the Third Circuit have applied the *Cavanagh* test. *See Commodity Futures Trading Comm'n v. Healy*, No. 09-1331, 2011 WL 1577819, at *2 (M.D. Pa. Apr. 26, 2011); *SEC v. Chiase*, No. 10-5110, 2011 WL 6176209, at *3-4 (D.N.J. Dec. 12, 2011) ("The touchstone is whether the party from which the SEC seeks disgorgement has any legitimate claim to the money." (citations omitted)); *see also SEC v. Infinity Grp. Co.*, 993 F. Supp. 324, 331 (E.D. Pa. 1998) (citing *Cherif*, 933 F.2d at 414 n.11 and observing that "it is axiomatic that we may impose equitable relief on a third party against whom no wrongdoing is alleged if it is established that the third party possesses illegally-obtained profits but has no legitimate claim to them"); *Antar*, 831 F. Supp. at 399 (quoting *Cherif*, 933 F.2d at 414 n.11). Consistent with the approach of these courts and mindful that the tipper's liability is imputed to his tippees, we shall determine whether the SEC has pleaded facts supporting a plausible inference that the relief defendants have received ill-gotten funds to which they have no legitimate claim.

The SEC alleges that on the morning of July 17, 2008, McGee called Michael almost immediately after speaking with the insider.[53] "Seconds" later, Michael attempted to reach his father at three different numbers and called his sister, Jillynn.[54]  That same morning, Michael purchased shares in Kellie, Jillynn, Geraldine, Mary, and Robert's respective accounts.[55] Michael funded these purchases for Kellie, Jillynn and Mary by selling holdings

---

[53] Compl. ¶ 60.

[54] *Id*. at ¶ 61.

[55] *Id*. at ¶ 62.

in those accounts.[56]   He also deposited additional funds into the accounts for the
purchases he made on behalf of himself and his wife, Kellie.[57]

The relief defendants argue that, as reflected in the complaint, they have a
legitimate claim to the profits they made on the sale of their PHLY shares because they
had an ownership interest in the principal used to purchase the shares in their accounts.
The SEC counters that the profits are ill-gotten gains of insider trading to which the relief
defendants do not have a legitimate claim.

The distinction between the monies used to purchase stock and the profits realized
was clearly drawn in *SEC v. Heden*, 51 F. Supp. 2d 296 (S.D.N.Y. 1999).  There, the
defendant stockbroker used his mother's account to  purchase shares in a company one
day before its acquisition was publicly announced.  *Id.* at 298.  The SEC charged the
stockbroker with insider trading, named his mother as a relief defendant, and sought to
freeze the assets in the mother's account.  *Id.*  The court first determined that there was
insufficient evidence to determine that the funds in the account belonged to the stockbroker
and not his mother, requiring application of the *Cavanagh* test.  *Id.* at 301-02; *see also*
*SEC v. McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 208 (N.D.N.Y. 2010) ("Where a
defendant treated an asset as his own, the asset should be treated as that of the
defendant and the *Cavanagh* test becomes irrelevant." (citation omitted)), *vacated in part*
*on other grounds upon reconsideration sub nom*, *SEC v. Wojeski*, 752 F. Supp. 2d 220
(N.D.N.Y. Nov. 22, 2010).  The court held that the profits were ill-gotten gains to which the

---

[56] *Id*. at ¶ 70.

[57] *Id*.

mother did not have a legitimate claim.  *Heden*, 51 F. Supp. 2d at 301-02.  Although the court found it was appropriate under *Cavanagh* to freeze the profits in the mother's account, it denied the SEC's request to freeze any more than the profits in the account. *Id.* at 302.  The court reasoned that the principal used to purchase the stock was not an ill-gotten gain and the mother had a legitimate claim to those funds.  *Id.* at 302 n.4.

The facts alleged in the complaint permit a plausible inference that the relief defendants' profits are the ill-gotten gains of insider trading.  As the SEC alleges, Michael purchased PHLY shares in the relief defendants' accounts on the basis of material, nonpublic information misappropriated from the insider by McGee.  The relief defendants then realized profits on the purchases after selling the shares.  The profits are causally connected to Michael's  alleged violations of § 10(b) and Rule 10-5 and are "ill-gotten." *See McGinn*, 752 F. Supp. 2d at 205 ("The ill-gotten gains must be linked to the unlawful practices of the liable defendants." (quoting *FTC v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 392 (D. Conn. 2009))); *cf. SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (observing that a court "may exercise its equitable power [of disgorgement] only over property causally related to the wrongdoing" (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989))).

The relief defendants argue that they have a legitimate claim to the profits because Michael used their money to purchase the shares.  To support this argument, the relief defendants rely on caselaw where courts rejected the relief-defendant designation because the relief defendants received proceeds of fraud as payment for services rendered.  *See* Mary and Jillynn Zirinsky's Mem. of Law in Support of Mot. to Dismiss the Compl. at 8 (quoting, for example, *Kimberlynn Creek Ranch*, 276 F.3d at 192, for the proposition that

"receipt of funds as payment for services rendered to an employer constitutes one type of ownership interest that would preclude proceeding against the holder of the funds as a [relief] defendant").  Here, the relief defendants were not Michael's employees and they did not earn the profits he made selling his PHLY stock.  Michael gifted his relief-defendant relatives with the inevitable profits of risk-free trades based upon misappropriated material nonpublic information.  Although he used the relief defendants' monies to effectuate this gift, the SEC alleges that his doing so was in violation of federal securities laws.  As in *Heden*, the relief defendants do not have a legitimate claim to the gains reaped from their stockbroker-relative engaging in securities fraud.

Geraldine and Kellie Zirinsky argue that they are not proper relief defendants because the trades Robert made for them were in IRA accounts, which are not subject to disgorgement under Pennsylvania law, specifically 42 Pa. Cons. Stat. § 8124(b)(1)(ix). Even if the profits in the IRA accounts are protected from disgorgement, the SEC may seek monies from other accounts representing Geraldine and Kellie's alleged ill-gotten gains. *See Banner Fund Int'l*, 211 F.3d at 617 (holding that "[b]ecause disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset," a defendant may not avoid disgorgement by arguing that he does not have access to the specific profits in question);[58] *cf. SEC v.*

_____

[58] The court continued:

An order to disgorge is not a punitive measure; it is intended primarily to prevent unjust enrichment. *See, e.g.*, *First City Financial Corp., Ltd.*, 890 F.2d at 1231.  Accordingly, a court "may exercise its equitable power [of disgorgement] only over property causally related to the wrongdoing." *Id.*  As the SEC points out, the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge.  To hold, as [the defendant]

*Rosenthal*, 426 F. App'x 1, 3 (2d Cir. 2011) (holding that "[t]he SEC is not required to trace specific funds to their ultimate recipients" where illicit profits were commingled and transferred with legitimate funds).   The relief defendants' motions to dismiss shall be denied.

## Conclusion

Because the complaint sufficiently alleges facts which, if proven, would establish a cause of action for insider trading under the misappropriation theory against McGee and Michael Zirinsky, their motions to dismiss will be denied.  Similarly, the relief defendants' motions to dismiss will be denied because the complaint alleges adequate facts showing the they were unjustly enriched from Michael Zirnisky's trading on misappropriated material non-public information.

Because there are insufficient facts alleged in the complaint to support a plausible inference that Robert Zirnisky acted with the requisite scienter, an essential element of the cause of action asserted, his motion to dismiss the complaint will be granted with leave to amend the complaint as to him.

---

maintains, that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results.  Under [the defendant's] approach, for example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement. [The defendant's] would be a monstrous doctrine for it would perpetuate rather than correct an inequity.

*Banner Fund Int'l*, 211 F.3d at 617.